**J. A. JONES CONSTRUCTION COM-
PANY, Plaintiff,**

v.

**GREENBRIAR SHOPPING CENTER,
etc., et al., Defendants,
SAM FINLEY, INC., and Daniel & Daniel,
Inc., Third-Party Defendants.**

**Civ. A. No. 10625.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 11, 1971.

Supplemental Opinion June 16, 1971.

Smith, Currie & Hancock, Atlanta, Ga., Fleming, Robinson & Bradshaw, Charlotte, N. C., for plaintiff.

William G. Grant, Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., for defendant Greenbriar Shopping Center.

Richardson, Chenggis & Constantinides, Chamblee, Ga., for Daniel & Daniel, Inc.

Webb, Parker, Young & Ferguson, Bertram S. Boley, Atlanta, Ga., for Sam Finley, Inc.

SIDNEY O. SMITH, District Judge.

This is a suit by a prime-contractor (Jones) for balances alleged to be due on a multimillion contract for the construction of the Greenbriar Shopping Center in suburban Atlanta. By way of counter-claim, the owner (Greenbriar) seeks general and special damages for alleged failures and breaches in the construction contract. Involved in this dispute are numerous "extras" claimed by Jones and numerous specific items of damage claimed by Greenbriar. Principal among the latter is a claim for defective paving of a parking area of some fifty acres. This occasioned a third-party complaint against the base and paving subcontractor (Finley) and a further third-party claim against the subbase contractor (Daniel) who was employed under a side agreement with the owner prior to the beginning of construction.

One of the prime defenses by the paving subcontractor as against the general contractor and by it against the owner's counter-claim is a claim denominated as "accord and satisfaction" or "release" as embodied in Work Order 154 between Greenbriar and Jones and Work Order 4 between Jones and Finley. At the trial of the case, evidence on this issue alone consumed all of the allotted time and, by consent of the parties, because of its effect on the future conduct of the trial, the Court agreed to make findings in this regard. On the evidence presented, the Court makes the following

## FINDINGS OF FACT

By an agreement dated August 15, 1964, Jones contracted to construct for Greenbriar a shopping center consisting at that time of an estimated number of building units together with the parking area in question. It was the mutual intention of the parties to detail the work to be done as requirements were made known and, traveling on the good faith of the parties to do so, construction was commenced. Under this scheme, plans and specifications were furnished from time to time by the Architect (Portman), figured by Jones as to cost, and mini-contracts entered into by the execution of specific work orders for each such project.

Greenbriar was represented by an on-the-site engineer, Schroeder, who supervised and coordinated construction. However, responsibility for inspection and acceptance rested upon the Architect, who from time to time issued "certificates of payment" for the work done plus a 4% override less a 10% retainage, all in accordance with the contract. Some 5½ million dollars was paid under this arrangement with nothing more than typical minor disputes between the parties.

An original opening date was targeted for August 15, 1965, but was subsequently delayed until September 23. In the rush of all parties to meet these deadlines, considerable confusion developed. Work was ordered, countermanded, and changed to try to complete varying aspects of the job around each other in order to satisfy rental commitments. Quite naturally, interference with the performance of one task by another ensued. Eventually, minor disputes developed into major ones, major disputes developed into serious charges and countercharges, communications failed and this law suit followed.

As to the paving dispute, it followed the route described above. As stated, the sub-base and rough grading was performed by Daniel on separate directives of the owner. The original specifications called for 95% soil compaction, but in the interests of speed and economy, the owner reduced these specifications to 88% compaction. The specifications for the parking area were as follows:

"Asphalt pavement shall be provided for parking and traffic lanes. Asphalt pavement shall consist of fine grading the area and installing 5½ inch crush-

er run base, plus prime coat and plus 1½ inch plant mix surface course. All areas shall be sloped to drain water and no low places shall be acceptable."

Both as to compaction and topping, these specifications are woefully substandard for the eventual intended use, particularly considering the original plasticity of the soil. In essence they constitute what is known as "light" paving. Nevertheless, proceeding under the subcontract, Finley undertook to execute the job. Paving actually commenced on May 12, 1965. At that time, the target opening date was still on August 15, 1965, only three months away. Consequently, Finley was under great pressure to complete the job from both Jones and Greenbriar, so much so that at times, paving was laid on direct orders from Schroeder under written protest from Finley. Of even more significance, Jones and its other subcontractors and Greenbriar and other independent contractors with it, such as landscapers, continually interfered with Finley's performance. As a result, the new paving was consistently abused by heavy trucks, cement mixers, water tank trucks, and other impedimenta for which it was obviously not designed.

Shortly after the September opening, it became apparent that the paving then complete was unsatisfactory. It was cracking and crumbling in certain places, there were some poor drainage areas, and core testings taken by the owner indicated that the base and topping were less than specified in some of the test locations. During the fall and winter of 1965–1966, Finley endeavored to complete the contract and undertook to make repairs as demanded. Heavy winter rains emphasized the deficiencies and all the parties began to document their contentions as to responsibility therefor. The paving job was flatly rejected by Greenbriar in March. Relations between Jones and Greenbriar over all aspects of the prime contract were meanwhile deteriorating, but the paving problem was the most obvious and critical focal point. A series of fruitless conferences and a salvo of written memoranda and de-

mands consumed most of the spring of 1966.

Finally, the architect moved to attempt a resolution of the overall paving problem. Through his graces, meaningful negotiations finally commenced in June. Significant amongst them was an admission by Greenbriar, by Jones, and by Finley of separate responsibility for the failure. The entire area was carefully plotted and individual sections marked and measured as needful of overhaul. Initially Jones and Greenbriar agreed upon a division of cost responsibility by specific sections for the needed repair and subsequently Jones and Finley subdivided their respective responsibility, again by section. In late July, it was agreed that each such section should be corrected by the addition of one inch of asphalt to compensate for any base or original topping deficiency with 2½ inches of asphalt to be applied in heavy duty traffic lanes, where the original specifications were obviously inadequate. The total cost of all work was estimated to be some $77,000 to be shared $27,000 by Greenbriar, $7,000 by Jones, and $43,000 by Finley. Based on the oral representations of the parties, Finley undertook in the fall to execute the agreed remedial paving on its and Jones' sections of responsibility, pending preparation of a written document incorporating the agreement obtained by the architect.

Because of its continuing overall dispute with Jones, Greenbriar very carefully refrained from any formal dealings with the subcontractor. Instead, the remedial work was authorized, as had been the custom, through a change-order, later to obtain considerable notoriety as "Change Order 154 of October 6, 1966." It was prepared by the architect and authorized Jones to do the agreed work at a price of $16,989.82 plus authorized quantity prices later fixed by Change Order 155 (together constituting the owner's share of the overall cost of $77,000). In addition it provided the following:

"8. *Patch and repair* all failures and breakage of the asphalt top which may

develop and occur before February 15, 1968, at any place on the entire asphalt top or base material or both as good construction practices require and crusher-run stone installed as required by good engineering practices and asphalt top placed thereon equal in thickness to that required by the original contract and this modification for the particular area which may be involved, except the obligation of this paragraph and shall not commence for the areas colored green on attached Edwards and Portman Drawing P–3 dated July 27, 1966, until the corrective work described above has first been completed. A bond shall be provided in the penal sum of $150,000.00 issued by a surety company qualified to do business in Georgia and reasonably satisfactory to Greenbriar, guaranteeing and conditioned upon the faithful and full performance of all obligations of the General Contractor described in this item 8.

"Notwithstanding the language or the form of this Agreement, J. A. Jones Construction Company agrees to perform the corrective work as described above subject to the following: The acceptance and execution of this Agreement by J. A. Jones Construction Company is expressly agreed by all parties hereto not to waive, modify or alter in any way J. A. Jones Construction Company's assertion that the above described work is work outside of the scope of its contract with Greenbriar Shopping Center and that the acceptance or the performance of this agreement concerning the above described work for Greenbriar Shopping Center does not waive, modify, alter, bar, or affect in any way J. A. Jones Construction Company's assertion that final payment, less a reasonable amount to cover the cost of any corrective work, which is the responsibility of J. A. Jones Construction Company, has been due and owing to J. A. Jones Construction Company by Greenbriar Shopping Center since February 6, 1966, under its contract with Greenbriar Shopping Center;

nor shall the execution of this change order by Greenbriar Shopping Center be deemed to waive, modify, alter, bar, or in any way affect the assertions of Greenbriar Shopping Center to the contrary. Neither J. A. Jones Construction Company nor Greenbriar Shopping Center, by executing and performing this agreement, makes any admission or waives any right to which it may be otherwise entitled except that the execution and performance of this agreement shall ratify and forever fix the responsibility of J. A. Jones Construction Company and Greenbriar Shopping Center to one another with regard to the corrective work on the paving at Greenbriar Shopping Center."

Following a minor change in specifications agreed to by all parties, Jones issued its Change-Order 4 to Finley incorporating all provisions of Change-Order 154, but subjecting payment to receipt by Jones. Finley accepted on October 15, 1966, conditioning delivery of the maintenance bond on receipt by it from Jones of all sums due thereunder and elsewhere on the contract.

Finley did in fact complete all of the remedial work prescribed in Change-Order 154 according to its specifications. On November 7, 1966, the Architect approved the work and issued his certificate of payment number 23.

Simultaneously, he approved some $400,000 in other payments to Jones, substantially exhausting the contract, but retaining $38,000 to cover the estimated cost of four items deemed incomplete at the center. Prior thereto, Jones had endeavored to extract a promise from Greenbriar to pay out all outstanding balances on the contract upon completion of the prescribed remedial work in Change-Order 154. To these entreaties, Greenbriar consistently responded that it would pay all sums due when the entire contract had been performed according to specifications. No promise to pay a specific amount was ever made, although it was apparently Greenbriar's intention to effect a major financial settlement at such time. However, there

was no binding agreement to pay all sums due upon the completion of Change-Order 154, although there was an understanding on Jones' part that it would be done. In fact, Greenbriar's agent, Schroeder, urged that a substantial payment be made the latter part of November. Additionally, the Architect fixed the remaining responsibility for the outstanding "punch-list" items as well as Change-Order 154 by a final inspection and inferentially urged payment, at that time, reserving a number of unresolved change-orders which had accrued over the job.

Meanwhile, a dispute over the maintenance bond had developed between counsel. This proved to be the opportunity for the undoing of all remaining good intentions between the parties, affording a lull for the gathering storm of disagreement to gain force. To preserve its lien rights, Jones filed this suit. The lawyers dickered back and forth on the question of the maintenance bond, Greenbriar refusing an obligation flowing from Finley and Jones not wanting to give its own bond. Finally, the form was agreed upon and arrangements made for Jones to execute it in favor of Greenbriar, and Finley to execute one in favor of Jones.

In February, 1967, a meeting was held at the office of Greenbriar's counsel to which lawyers, bonding agents, and some of the parties repaired. However, the bonds were not delivered because of Greenbriar's refusal to make final payment.

As seen, the maintenance period for the paving under Change-Order 154 was to extend through February 15, 1968. The obligation thereunder was to "patch and repair all failures and breakage of the asphalt top which may develop and occur before February 15, 1968, at any place on the entire asphalt top or base material." Within the industry, the term "failures and breakages" means a separation of material and cracking.

Under the prodding of Jones and advice of counsel, Finley undertook to make repairs during the maintenance period. Sometimes these were made on direction of Greenbriar and at others on Jones' instructions or its own inspection and appraisal. During the period from December 1, 1966, to February 15, 1968, Finley cut out and replaced or else overlaid some 4,000 square yards of paving at a cost of $8,252.75 and of a value of some $11,000.00 in this undertaking. In February and March, Finley attempted to secure approval from Greenbriar by a final inspection and acceptance of its work in performance of the maintenance agreement, but Greenbriar refused to inspect or accept.

While this substantial effort was made, not all repairs anticipated by Change-Order 154 were made. Prior to the expiration of the guaranteed maintenance period on February 15, 1968, visible cracks appeared in a number of places in the parking area. Those which led to obvious damage prior to that date and "needed repair" were repaired. However, those cracks which appeared, but which had not yet caused visible damage, were not. Such cracks constituted a "failure" within the meaning of Change-Order 154 and were subsequently repaired by Greenbriar. While Change-Order 154 did not constitute an indefinite continuing guarantee, it did contemplate the repair of visible cracks which could cause damage for a reasonable period after February 15, 1968. Repairs by Greenbriar within the period of the maintenance guarantee and a reasonable period thereafter cost Greenbriar the sum of $2,751.79.[1] Otherwise, the obligations of the maintenance period were fully performed by Greenbriar.

The gross balance due on Change-Order Number 154 to Jones from Greenbriar is $27,912.35. The gross balance due on Change Order Number 4 to Finley from Jones is $35,312.85.

## CONCLUSIONS OF LAW

Insofar as the paving portion of the prime contract is concerned, Change Or-

---

1. These are the proven expenditures for this purpose through February 15, 1969.

der Number 154 was a compromise and mutual accord and satisfaction between Greenbriar and Jones. Likewise as between Jones and Finley, Change Order Number 4 constituted a similar compromise and mutual accord and satisfaction. Ga.Code § 20–1205; § 20–1201. Hale v. Lipham, 61 Ga.App. 191, 6 S.E.2d 115 (1939).

■ As such, either is immediately binding upon the parties and terminates the prior obligations and prior controversy between them insofar as the subject-matter therein compromised. Its effect is not dependent upon complete and literal performance; rather, after execution, the parties are relegated to their remedies thereunder. Belt v. Lazenby, 126 Ga. 767, 56 S.E. 81 (1906); City Electric Railway Co. v. Floyd County, 115 Ga. 655, 42 S.E. 45 (1902); Crisp County Ga. v. S. J. Groves & Sons Co., 73 F.2d 327 (5th Cir. 1934). This distinguishes the agreement from a mere accord which is dependent upon complete performance before it operates in satisfaction of the original agreements. E. g., Brunswick & Western Ry. Co. v. Clem, 80 Ga. 534(4), 7 S.E. 84 (1888). See in this regard, Byrd Printing Co. v. Whitaker Paper Co., 135 Ga. 865 at 868, 70 S.E. 798 (1911).

■ The court is persuaded to this view by many factors. First and foremost is the language in the agreement itself to the effect that:

"the execution and performance of this agreement shall ratify and forever fix the responsibility of J. A. Jones Construction Company and Greenbriar Shopping Center to one another with regard to the corrective work on the paving at Greenbriar Shopping Center."

At the time there was present a genuine controversy over the paving and whether it complied or did not comply with the specifications. If it did not comply, there was a controversy over responsibility. Under these circumstances, concessions were made and new considerations entered into by the parties. The requirement of a maintenance period secured by a bond was substituted for the original provision regarding corrective work under the prime contract. Thereafter each party was bound to the enforcement of its provisions rather than the original contract insofar as the paving requirements are concerned.

The same situation existed on Change-Order Number 4 between Jones and Finley with two special provisions (neither of which was binding on Greenbriar): Jones conditioned payment to Finley upon receipt from Greenbriar and Finley conditioned the furnishing of a bond upon payment from Jones.

Under these circumstances, the court finds that Change-Order Number 154 was not literally performed by Jones in these respects:

(1) The bond was not furnished.

(2) The maintenance was not completed in accordance with Paragraph 8.

However, as to the bond, maintenance for the period required under Paragraph 8 would have satisfied the bond requirements. If the failure to furnish a bond in proper form during a reasonable time after the execution of Change-Order 154 constitutes a technical breach of the compromise agreement, then Greenbriar's remedy is merged into the obligation it supported, namely, the maintenance guarantee. Likewise, Greenbriar's remedy for any default in the maintenance guarantee are the damages due to such failure.

■ 1. As to Jones and Finley, the court finds that Change Order Number 4 completely extinguished all claims of either for any liability on the paving specifications, as amended, in the prime contract. Jones is due a credit of $2,-751.79 for the damages occasioned by Finley's failure to maintain to such extent and Jones owes Finley the sum of $32,561.06 upon receipt from Greenbriar. If Finley contracted independently with Greenbriar for any paving work outside of the prime contract, then such claim

stands on its own and is subject to proof hereafter.[2]

2. As to Jones and Greenbriar, the court finds that Change Order Number 154 extinguished completely all claims of either for any liability on the paving specifications, as amended, in the prime contract. Greenbriar is due a credit of $2,751.79 thereon for the damages occasioned by failure to maintain and Greenbriar owes Jones the sum of $25,160.56, *subject to the rights of the parties under the prime contract.*

As indicated, the court does not find that Change-Order 154 compromised any claims, other than paving, under the original contract between Greenbriar and Jones. The court finds no promise to pay therein other than the amounts stated in Change-Order 154. The telegrams and oral statements of Hawn in the fall of 1966 simply do not contain such a promise. If so, they are not supported by any new consideration therefor. Moreover, it appears clear that these two parties specifically preserved their respective claims and rights under the prime contract (other than paving) by the detailed language of the last paragraph of Change Order No. 154.

The court could not at this time, nor was it intended, hazard a guess as to all the rights and liabilities involved in the remaining disputes between them. At present it does appear that the following issues remain in the case:

*As to Jones*

(1) The amount of "certified" work performed by Jones.

(2) Resolution of the items, for which $38,000 was specifically "retained" in November, 1966.

(3) Unresolved change orders and/or extras claimed.

(4) Any general damages otherwise due to Jones. (doubtful)

*As to Greenbriar*

(1) Any special damages due from Jones failure to meet specifications of the prime contract, other than the paving aspects.

(2) Any general damages due from Jones failure to perform the prime contract.

Counsel are directed to confer as to the resolution of any of the above, particularly the unresolved change orders and/or extras, and thereafter to notify the court as to the estimated time needed to present evidence on the remaining issues for schedule purposes.

An appropriate order incorporating the finding in favor of Finley's special defense of compromise, with the exceptions noted, may be presented by counsel.

It is so ordered.

## SUPPLEMENTAL OPINION

This is the second half of a double feature tragedy involving the broken romance between the owner-developer

---

2. These findings effectively remove Finley from the case with two minor exceptions:

(1) Jones obligation to pay under Change Order 4 was conditioned upon receipt from Greenbriar. If Greenbriar's debt under Change Order 154 is withheld under its general retainage rights on the prime contract, then the interesting question appears whether Finley's, judgment must await resolution of the remainder of the case. Without so ruling, a reasonable argument could be made that Jones has effectively been paid by prior payments and that the sums due by Greenbriar under Change Order 154 were simply applied by it to 10% retainage on the prime contract. Inter-

est could conceivably run on Change Order 4 from the date Finley offered its bond to Jones, or from February 15, 1968, when the work required thereunder was substantially completed. If the parties desire rulings on these matters, informal motions and briefs should be made.

(2) At trial, Finley contended that at least one contract was made by it directly with Greenbriar and outside the prime contract. All subcontracts within the prime contract even if claimed as authorized "extras" were extinguished by the compromise. If the independent claim still exists, then the court should be notified so that trial may be scheduled.

and general contractor of a giant shopping center. When the spat broke into open dispute with the filing of this suit almost five years ago, the parties reacted typically. Countless informal mutual good faith departures from the original contract and specifications were resurrected as diabolical dastardly deeds in the harsh light of the letter of document and the law. No project of this scope with the attendant pressures on everyone concerned could possibly be completed in accordance with the literal scheme envisioned by an architect-drawn agreement. In truth, even the AIA standard contract would require a battery of Philadelphia lawyers on the firing line each day. Under it, everybody is liable save the architects. Nonetheless, it is court's lot to sort out the disputes and endeavor to resolve them in accordance with the spirit of the transaction and hopefully the letter of the governing agreements. Principal among them was a series of claims arising out of the paving subcontract with the third party defendant, Sam Finley, Inc. With a minor exception hereinafter referred to, the court ruled on the first trial that all claims were compromised in the now famous Change Order No. 154 (Order of February 10, 1971). For all practical purposes, that left unresolved the claims and counterclaims between the owners ("Greenbriar") and the prime contractor ("Jones").

As background for this resolution, as of November 7, 1966, the Architect had issued certificates of payment under Articles 13 and 14 of the contract, which had created a 10% "retainage" pending completion and acceptance by the Architect of $514,652.23. Payment thereof was refused by the owner on account of the paving dispute and the presence of outstanding claims between the parties. Principally, they were unresolved change-orders for which Jones claimed additional compensation and various credits claimed by Greenbriar for failure in specifications. Additionally, each party claims special damages for delay in completion allegedly caused by the other. Happily, prior to and during trial, counsel were able to stipulate certain of these items. These substantial stipulations [1]

1. The details are as follows:

|  | ITEM | CHANGE-ORDER | DEBIT | CREDIT |
|---|---|---|---|---|
| May 21st stipulations | Rich's Compaction | 9 | $ 4,203.00 | $ |
|  | Crusher Run Stone | 126 | 13,501.73 | |
|  | Roofs and Canopies | 137 | 37,936.00 | |
|  | Lorne Plumbing & Heating | 140 | 18,345.59 | (conditioned on meter change) |
|  | Extra Painting | 144 | 2,701.54 | |
|  | Floor Slab Decrease | 149 | | 32,500.00 |
|  | Sidewalk Decrease | 150 | | 516.00 |
|  | Penny's Overtime | | 7,901.76 | |
|  | Paving Repairs | | Withdrawn | |
|  |  | 155 | This claim is included in Order of Court dated February 10, 1971 | |
|  | French Drain | | 2,155.80 | |
|  | Asphalt Repair | | Withdrawn | |
|  | Replacement of Cables (Supplemental Complaint) | | Withdrawn | |
| Trial Stipulations | Steak-House column and allied claims | | | 12,000.00 |
|  | Thompson-Boland-Lee *rent rebate* | | | 900.00 |
|  | TOTALS | | $86,745.42 | $45,916.00 |
|  |  | | $40,829.42 | |

resulted in a net additional credit to Jones of $40,829.42. There remain items which may be categorized as follows:

(1) Additional Finley claims.

(2) Claims for defects in construction.

(3) The O. V. Scott subcontract.

(4) Cross-claims for delay.

(5) Liability for interest.

*(1) Additional Finley claims.*

In formal fashion Greenbriar had contended for general damages allegedly due for the paving over of areas originally scheduled as planting islands. However, this was done by agreement and no evidence was offered as to a monetary loss for this development. However, two other paving items were left after the former trial under the first of which Greenbriar is due some credit. This arose from work performed by Finley under a change in plans whereby certain circles were poured in the parking areas. In this respect, the parties are in agreement as to regular concrete curbs and gutters poured near the Headland Drive entrance at a stated price of $2.75 per foot and some 2,200 feet of asphalt curbing and 9,000 feet of asphalt-cement curbing. However, some 3,321 feet of straight concrete curbing and some 495 feet of curved concrete curbing was poured and pinned to existing asphalt. Jones (and Finley) contend that such a procedure is more expensive than a normal pour of curbing prior to asphalt paving and reasonably worth $2.65 to $2.75 per foot in the quantity laid. However, they seek only the original contract price of $1.74 per foot. Greenbriar, on the other hand, contends that such procedure is worth less and only $1.10 per straight foot and $1.35 per curved foot. On the issue, Finley presented competent witnesses to justify its claim of $1.74 per foot or more. No

evidence was presented to show a lesser figure save any inferences which could be made from the facts. The court concludes that $1.74 per foot is the proper figure. Because of the status of the account (See Finley #15), this results in a net credit to Greenbriar of $3,778.80.

Additionally Greenbriar contends that the curb around the Headland Drive entrance was defective due to tilting and sinking with the result that the asphalt paving is now level with the curb top and no drainage is provided thereby. Greenbriar's estimate of cost to correct this approximately 200 feet of curbing is $1,800.00. The court finds that the trouble was due to water eroding the base out from under the curb over a period of time causing slippage. The excess water was due to faulty grade, the omission of specified storm sewers by the owner, and the laying of original paving when the base was wet. However, the evidence reveals that the original paving was done under protest and at the express direction of Greenbriar (see letter of September 17, 1965). Moreover and more importantly, the area was repaved under C. O. #154 with 2½ inch overlay and is in the area of accountability to Greenbriar under the compromise (See Finley #16). Accordingly, any claim due to the paving was wiped out in the agreement. The consequent damage to the island is likewise extinguished absent evidence of faulty upkeep during the maintenance period. None is present here. The claim on this item is therefore denied.

For the reasons stated, Greenbriar is due a total credit of $3,778.80 against Jones for the Finley claims.

The court is further of the opinion that Finley is entitled to immediate judgment and satisfaction for any amounts remaining due under the contract with Jones. See MacLeod v. Belve-

dale, Inc., 115 Ga.App. 444, 154 S.E.2d 756 (1967); Wilbanks v. Smith, 35 Ga. App. 431, 133 S.E. 300 (1926). Moreover, counsel correctly asserts that Jones has in fact been paid by Greenbriar for the base amount of the Finley contract, the balances remaining being allocable solely to the 10% retainage. However, payment was conditioned on "acceptance" of the work performed. The repaving done under the compromise was not "accepted" until done so perforce through the court's order. Consequently, any sums due therefor should not bear interest until the decree of that acceptance on February 10, 1971. Any remaining amounts should bear interest from February 15, 1967, the date on which Finley contends that its entire subcontract was completed.

(2) *Claims for defects in construction.*

■ Greenbriar claims credit for ten specific items, allegedly defective for variance with specifications or for faulty workmanship. The evidence presented to the court indicates that each item is substandard in result to some extent. The problem lies with the question of damages. Under Georgia law, the owner is entitled to performance of a construction contract in accordance with the specifications and in a workmanlike manner. See Cannon v. Hunt, 116 Ga. 452(3), 42 S.E. 734 (1902); Maner v. Clark-Stewart Company, 27 Ga. App. 553, 109 S.E. 178 (1921); Candler v. Hunnicutt, 35 Ga.App. 120, 132 S.E. 140 (1925). In the case of a failure, the true measure of damages is the difference in value of the construction as delivered and the value it would have had if completed in accordance with the contract. Kendrick v. White, 75 Ga.App. 307, 43 S.E.2d 285 (1947); McKee v. Wheelus, 85 Ga.App. 525, 69 S.E.2d 788 (1952); Spielberg v. McEntire, 105 Ga. App. 545, 125 S.E.2d 134 (1962); Kuniansky v. D. H. Overmyer Warehouse Co., 406 F.2d 818 (5th Cir. 1969). Of course, in some instances, the actual cost of practicable repairs when they fully correct the deficiency is tantamount to this loss in market value.[2]

■ Under Georgia law, the trier of fact has complete freedom to set the damages without regard to any specific testified. Ga.Code § 38–1709; Southern Cotton Oil Co. v. Thomas, 155 Ga. 99 (8), 117 S.E. 456 (1922); Johns v. League, Duvall & Powell, Inc., 202 Ga. 868(1), 45 S.E.2d 211 (1947); Lee v. Creaty, 104 Ga.App. 429, 121 S.E.2d 841 (1961). Moreover, the trier of fact is not absolutely bound by the opinion as to value of any witness, even though uncontradicted, but may draw from experience and knowledge in fixing damages for market value. *E. g.*, National Ben Franklin Fire Insurance Co. v. Purvis, 61 Ga.App. 674, 7 S.E.2d 296 (1940); Watson v. Tompkins Chevrolet Co., 83 Ga.App. 440(3), 63 S.E.2d 681 (1951); Imperial Investment Co., Ltd. v. Modernization Construction Company, 96 Ga.App. 385(3), 100 S.E.2d 107 (1957). Accordingly, the court received evidence as to each alleged failure, any diminution in market value by reason thereof, and costs of repair. In some instances, repair is deemed practicable and in full satisfaction of the failure; in others, the market value is permanently

---

2. AIA ARTICLE 20 provides: CORRECTION OF THE WORK AFTER SUBSTANTIAL COMPLETION. The Contractor shall remedy any defects due to faulty materials or workmanship and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of Substantial Completion as defined in these General Conditions, and in accordance with the terms of any special guarantees provided in the Contract. The Owner shall give notice of observed defects with reasonable promptness. All questions arising under this Article shall be decided by the Architect subject to arbitration, notwithstanding final payment.
AIA ARTICLE 17 provides: DEDUCTIONS FOR UNCORRECTED WORK. If the Architect and Owner deem it inexpedient to correct work injured or done not in accordance with the Contract, an equitable deduction from the Contract Sum shall be made therefor.

affected. Without elaborating on the details of each complaint, the evidence and findings of the court may be summarized as follows:

| ITEM | 1966 REPAIR GREENBRIAR * | COST JONES | DIMINUTION ** IN MARKET VALUE | DAMAGES ALLOWED |
|---|---|---|---|---|
| (1) Rich's Plaza | $ 2,812.50 | $2,500.00 | $ 6,271.75 | $ 3,000.00 |
| (2) Other poured concrete | 4,875.00 | 1,000.00 | 11,387.50 | 1,000.00 |
| (3) White concrete | 11,250.00 | 5,000.00 | 28,128.00 | 15,000.00 |
| (4) Polyvinyl Chloride | | | | |
| (a) canopies | 1,500.00 | 2,000.00 | 3,750.00 | 2,000.00 |
| (b) cap flashing | 4,500.00 | 900.00 | 11,250.00 | 3,000.00 |
| (5) Cove Lighting *** | | | 5,000.00 | 1,000.00 |
| (6) Quarry Tile | 6,000.00 | 1,500.00 | 15,000.00 | 5,000.00 |
| (7) Water Pit | 200.00 | 100.00 | 351.00 | 200.00 |
| (8) Picadilly Brick | 100.00 | 100.00 | 187.50 | 100.00 |
| (9) Mall beams | 100.00 | 100.00 | 187.50 | 100.00 |
| (10) Switch-gear panels | 500.00 | 500.00 | 1,000.00 | 500.00 |
| | | TOTAL | | $30,900.00 |

\* Greenbriar's witness reasons that 1966 repair cost, which could have been made by the owner to mitigate damages at the time are 25% less than today's costs. In some instances, previous answers to interrogatories propounded to defendant specified answers less than the testimony.

\*\* Greenbriar's witness likewise, somewhat speculatively, estimates the difference in market value at approximately 2½ times the 1966 repair cost on all items. This includes some amount for "worry and trouble."

\*\*\* It is not clear who authorized the present installation. The original plans had to be modified to allow for downspouts and the present complaint is that the "gaps" in continuous strip lighting allowed therefor are excessive. The court agrees that 3 feet or 4 feet is at least twice too wide and that a gap of 12 inches—18 inches could have been utilized for the downspout.

---

On the basis of the above, Greenbriar is entitled to a total credit of $30,900.00.

(3) *The O. V. Scott subcontract.*

In this matter, Scott, an electrical subcontractor, was granted a contract containing a payment for $18,789.68 as premium or bonus provided the electrical work on the J. C. Penney building was "substantially completed" by May 15, 1965. (See Change-order #46). With no change in the contract, revisions in the specifications were made in late April. While Scott actually performed some overtime and premium work he concededly did not effect a "substantial completion" by May 15th as required by the contract. With nothing more, there would be an outright failure and breach of the contract for which Greenbriar would be entitled to collect.

However, with both parties knowing full well of the failure, the change-order was signed and approved for the full amount including the premium payment on July 8, 1965, and paid (less 10% retainage) on July 19, 1965 (See Certificate of payment No. 13). The actual work was not completed until August. The sum in question was subsequently remitted by Jones to Scott. In November, when relations between the parties had become strained, Greenbriar unilaterally deducted $16,910.72 ($18,789.68 less retainage) for the alleged failure. While Jones contends that Hawn, one of the Greenbriar principals, agreed in January, 1966, to repay the sum, the evidence thereof is inconclusive. The only written evidence is an unanswered letter of January 7, 1966, from Jones to Schroeder, declaring that such agreement had been made. The reply letter neither admits nor denies the declaration. The court concludes that there is insufficient evidence to establish this alleged parol agreement to pay.

In such a situation, the question resolves itself into a determination

whether the voluntary payment in July by Greenbriar, with knowledge of the circumstances, waives or estops reliance on the clear language of the contract. "Except where otherwise provided by statute, a party can not, by direct action or by way of set-off or counterclaim recover money voluntarily paid with a full knowledge of all the facts, and without any fraud, duress, or extortion, although no obligation to make such payment existed." Georgia Code § 20–1007; McCarty v. Mobley, 14 Ga.App. 225, 80 S.E. 523 (1914); Mitchell v. Holden, 58 Ga.App. 712, 199 S.E. 835 (1938). Thus, in the absence of mistake and none is shown or claimed here, Greenbriar was not entitled to deduct the prior voluntary payment and may not recover it in this action. See also Chapman v. Ellis, 58 Ga.App. 614, 199 S.E. 650 (1938); Commerce Finance Company v. Perry, 67 Ga.App. 491 at 503, 21 S.E.2d 123 (1942); Barker v. Federated Life Ins. Co., 111 Ga.App. 171, 141 S.E.2d 206 (1965). Inasmuch as the sums in question have already been paid out to Scott for premium work actually performed in reliance on the approved payment, there is no consideration of whether "equity and good conscience" dictate that the payment not be retained. *Cf.* Cloppas v. C & S Bank, 95 Ga.App. 365, 98 S.E.2d 153 (1957).

For the reasons stated, Greenbriar is not entitled to any credit for the O. V. Scott premium payment.

(4) *Cross-claims for delay.*

As indicated earlier, the project was executed under great pressure on all parties. Conceived as it was, the original contract provided for work to commence with numerous details to be worked out by the architect, owner, and contractor during construction. In this haste, some usual delays and some unusual delays developed. The result was that some work was still going on in January, 1966, some four months after the "grand opening"

on September 23, 1965. Delay, of course, is expensive on everyone.

Jones shows an expense of $40,676.15 (Ex. "B") in continued overhead. Greenbriar, on the other hand, had negotiated rental contracts commencing during August and shows a certain loss of $44,722.25 (Ex. #63) in rents through September 30, 1965, and an undetermined amount of overhead, probably in the neighborhood of $10,000 (See Ex. #57). Each, of course, contends that the loss was occasioned by the other.[3]

Contractually, the following provisions are pertinent:

ARTICLE 1 (in part): "The design and preparation of all working drawings for the entire work including Architectural, Structural, Mechanical and Electrical, will be prepared under the direction of Edwards and Portman, Architects, Atlanta, Georgia, therein and hereinafter called the Architect. Said drawings are to be prepared as far in advance of the various phases of construction as reasonably possible to enable the Contractor to properly plan the work, purchase materials and subcontracts and coordinate the work in the most economical and logical sequence of work."

ARTICLE 2: "TIME OF COMPLETION.

The work to be performed under this Contract shall be commenced and completed as follows: start foundations approximately August 15, 1964, and substantially complete all work by August 15, 1965."

AIA ARTICLE 1 (in part): "(h) The date of substantial completion of a project or specified area of a project is the date when construction is sufficiently completed, in accordance with Contract Documents, as modified by any change orders agreed to by the parties, so that the Owner can occupy

---

3. Additionally, Jones claims a delay due to strikes. However, any right to claim an extension was apparently forfeited by failure of literal compliance with AIA ARTICLE 18 of the contract. (See P.

#7, letter to owner, instead of architect). Florida N. R. Co. v. Southern Supply Co., 112 Ga. 1, 37 S.E. 130 (1900).

the project or specified area of the project for the use it was intended."

ADDENDUM 4: "Time being the essence of this contract, a detailed project construction schedule is being prepared by the contractor and will be subject to the approval of the owner, and will be thereafter made a part hereof."

ARTICLE 5 (in part): "Final payment shall be due by the Owner to the Contractor thirty (30) days after the contract is completed and accepted by the Architect. A ten (10%) percent retainage will be withheld until the Contract is so completed and accepted by the Architect."

Apparently without legal complaint, the opening date was agreeably changed by Greenbriar from August 19, 1965, to September 23, 1965. Rich's itself opened on September 9. On September 23rd, some 18 stores out of a possible 42 opened for business. On the evidence presented, the fault must be shared by the parties. From a technical point of view, the architect declared the project "substantially completed" as of September 23, 1965 (See Letter of July 12, 1966). See as to the binding effect of such a decision State Highway Department v. MacDougald Const. Co., 189 Ga. 490(2), 68 S.E.2d 570 (1939) and authorities cited therein. At trial, the architect testified that in reality it was substantially completed on August 15, 1965. The factual controversy centers around responsibility for the time allocable to "tenant work," which may be defined as the time needed after completion of the main structure to customize space for the lessee and to permit him to install his own fixtures. Under the evidence, this time varied from 30 to 120 days, averaging about 60 days for each tenant. The main provisions of the contract are silent in this regard. Several construction schedules were prepared in accordance with Addendum 4 which indicated allowance for some tenant work within the stated completion date. However, these were constantly revised up into the summer of 1965 and none was formally made a part of the prime contract. Moreover, actual implementation of the tenant work ended up partially in the contractor's hands, partially in the owner's hands (See P. #1), and partially in the hands of the respective tenants. Responsibility for delays in each instance is impossible to allocate under the evidence.

Undoubtedly, Jones caused delay through the failure of its subcontractors and materialmen to perform, principally CMI, the pre-cast concrete supplier. On the other hand, Greenbriar caused delay by a constant change in design and the late furnishing of drawings by its architect. There were approximately 150 change-orders issued on the job, most of which were executed after the work had begun. In 23 instances, even the price was not agreed upon until the work was completed. Substantial changes were made as late as August, 1965, and many change-orders show dates of September, October, and November long after the opening. While it is impossible to allocate specific responsibility for each change, it is apparent that many were not even ordered until after the scheduled completion date. Overriding the entire situation was the mutual paving dispute and delay occasioned thereby as well as punch-lists and mechanical adjustments of varying magnitude.

■ Thus, each party proximately contributed to the delay. Under such circumstances, the law does not provide for the recovery or apportionment of damages occasioned thereby to either party. 17A C.J.S. Contracts § 502(4)ff. Ga.Code § 20–1104. Specifically, see Greene County Oil Co. v. McCaw Mfg. Co., 9 Ga.App. 39, 70 S.E. 201 (1911); Hollister Bros. v. Bluthenthal & Bickart, 9 Ga.App. 176, 70 S.E. 970 (1911); Bernstein v. Fagelson, 38 Ga.App. 294, 143 S.E. 237 (1928); Bancroft v. Conyers Realty Co., 63 Ga.App. 106, 10 S.E. 2d 286 (1940).

For the reasons stated, the claims for delay by each party are rejected.

5. *Liability for interest.*

■ Because of the amounts involved and the length of time elapsed in

this protracted litigation, the question of interest rises to significant importance. The plaintiff contends that the issuance of Certificate No. 23 by the Architect entitles it to interest from that date. The payment provisions of the contract negate any legal significance to the certificate and the court agrees that it is a nullity in respect to fixing time for payment inasmuch as it relates to items not contemplated in the scheme of payment on the basis of architect's certificate. (See ARTICLES 13 and 14 and addendum). Defendant places great store on the provision of ARTICLE 5 regarding final payment insisting that the term "complete" is literal rather than substantial; and that literal failure precludes liability until now. *E. g.* Griswold v. Scott, 13 Ga. 210(2) (1853); Perlis & Sons v. Peacock Construction Co., 222 Ga. 723, 152 S.E.2d 390 (1966). That argument is likewise rejected as literal performance is seldom required in building contracts. 17A C.J.S. Contracts § 508ff. To hold otherwise would permit non-payment of a huge sum on the absence of a 50¢ light-switch, a quart of paint, or the like.[4] Nor can a debt be said to be unliquidated simply because of some theoretical counterclaim for unliquidated damages. The risk of interest is on the debtor when he does. In Georgia, some discretion rests in the trier of fact dependent upon the circumstances. *E. g.* Snowden v. Waterman & Company, 110 Ga. 99, 35 S.E. 309 (1900).

■ The fair rule to be applied in building contracts is to ascertain the stated debt due at a certain time and deduct therefrom a reasonable amount for remedying defects. (See AIA ARTICLE 26). The former should bear interest from the date it is ascertained or demanded; the latter should bear interest only from the time the dispute is resolved, even if it is at trial. Ga.Code § 20–1408; Ga.Code § 57–110; Horkan

v. Great American Indemnity Co., 211 Ga. 690, 888 S.E.2d 13 (1955).

■ In this instance, Certificate 23 bears some significance in that it constitutes a statement of account as of that date—November 7, 1966. This is the earliest date the court can find for an ascertained total debt. From it, some $38,000 was authorized to be withheld. At the time, there also remained in suspense many unresolved change orders, the paving dispute, and other matters not completely determined until trial. Retention of sums for claimed defects could properly be withheld against plaintiff's pending claims. There is no question of demand as the record is replete with insistance on payment for at least a year.

Accordingly, the court rules that interest at 7% is due on plaintiff's claims as follows:

On $426,938.62—from November 7, 1966;

On any sums due under Change Orders 154 and 155—from February 10, 1971;

On the remainder—from date of this judgment.

## SUMMARY

Judgment may issue on the following principal sums together with interest as hereinbefore specified as follows:

DUE JONES

| | | |
|---|---|---|
| "Certified Retainage" | $514,652.23 | |
| Trial Stipulations | 40,829.42 | |
| Correction on Feb. 10, 1971 order | 1,051.78 | |
| | | $556,533.43 |
| LESS CREDITS | | |
| Finley curbing | 3,778.80 | |
| February 10, 1971, order | 2,751.79 | |
| Claims for defects | 30,900.00 | |
| | | $ 37,430.59 |
| TOTAL PRINCIPAL DUE | | $519,102.84 |

Counsel for Jones and Greenbriar are directed within five days to review the figures stated herein for correctness, to

---

4. Or in times of high interest rates, allow a project to be financed by a creditor. Originally, plaintiff sought to recover in excess of the legal rate on this theory, but was unable to produce authority for such an award.

calculate past interest in accordance with (5) hereof and to furnish the Clerk with appropriate sums for final judgment. It appearing that a lien was timely filed, such judgment may likewise include the same. (See P. #10 and 11).

If a separate formal judgment is desired by Finley then the same instructions apply.

It is so ordered.